*In re* NEVINS' WILL.

(*Surrogate's Court, Westchester County, Filed June,* 1893.)

**WILL—SUBSCRIPTION BY TESTATOR.**

> One of the witnesses to a will testified he did not remember seeing testatrix sign the paper or make her mark, and another witness swore positively he did not. Their evidence did not disclose that either of them was in the room when the mark was made, but the third witness (the attorney who drew the will) testified that the whole business of the preparation, execution and witnessing of the paper was done at the same interview, including the signing by the deceased and the three witnesses. The other witnesses testified that neither of them saw the attorney sign as a witness. *Held,* that the proof was not satisfactory of the subscription by the testatrix in the presence of two witnesses, and probate should be refused.

Probate of alleged will of Jane Nevins. Denied.

F. X. Donoghue, for proponent; Arthur J. Burns, special guardian, for contestant, Anna Nevins; James H. Moran, special guardian, for Peter Nevins, son of decedent.

COFFIN, S.—This is a remarkable case in this respect: that the alleged will bears a date which was five days subsequent to the date of the death of the decedent. The proof that she died on the 4th day of August, 1891, is abundant and conclusive. While the attorney who drew the will testified that it was prepared and executed on the day of its date, the witnesses Neely and Clinch both swear that they signed the paper about a year before her death. The attorney is evidently mistaken in this. Ordinarily a mistake in the date is of little importance, but it may become so in connection with other facts. The attorney was a witness in this proceeding, and testified that two different kinds of ink were used in the written parts of the blank—one a pale, and the other a darker, ink. This is apparent from an inspection of the paper. In the blank formal part of the commencement of it there was printed: "I" (blank), "of" (blank),

"county of" (blank), "and State of" (blank), "aged" (blank), and the blanks were filled with "Jane Nevins," "Yonkers," "Westchester," "New York," "about fifty," all with the pale ink, except "New York," which was with the darker. In the disposing part, after the printed words "I give," was written with the pale ink, "and bequeath to Finton Phelan, all my property of every name and description, in trust, nevertheless, to collect the rents and profits and pay over the same to my son Peter Nevins." Then immediately follows in the darker ink, "until he shall attain the age of twenty-one years, at which time I hereby direct my said executor and trustee to convey to my said son Peter Nevins all my property of every nature and description." Then follows a blank space of 42 ruled lines, to the foot of the third page, where the witnesses signed with the same pale ink. The same ink was used in filling in the name of the executor in the blank for it, the name of the deceased in two places, and the rest of the blanks to the end, including the blanks in the attestation clause and the signatures of the witnesses, except in the blanks for the date. While the "ninth August" are in the same ink, the "ninety-one" is in the darker, and also the name of the attorney, subscribed as a witness. The attorney testified to the different inks as above stated, and attempts to account therefor by saying that he sometimes took ink with him, but does not say that he did in this instance. The paper was prepared and completed, as he states, at the house of decedent, who was ill in bed, on the single occasion. It seems scarcely credible that he should have written at the same time "Jane Nevins," "Yonkers," "Westchester," in the pale ink, then "New York" in the dark ink, and then immediately changed to the pale ink in writing "about fifty;" and the same remark will apply to the dating of the will, "ninth" and "August" being in the pale ink, and "ninety-one" immediately changed to the dark. Both the other subscribing witnesses swear that they did not see the lawyer sign his name, which was written with the dark ink, as a witness. Now, this lawyer had no interest in the matter, so far as appears, other than profes-

sionally, and no motive can be readily assigned prompting him to do anything unprofessional.   He took this alleged will with him, and it remained in his hands more than two years—from the time of its alleged execution until about January, 1893.   It was then called for by ex-Judge Thayer, but the lawyer refused to deliver it to him, except upon the order of the executor or Peter Nevins, the alleged beneficiary.   Subsequently Judge Thayer presented an order from the latter, and the paper was delivered to him.   The evidence and circumstances seem to indicate that in the interval, having examined the paper and discovered the blanks unfilled, now in the dark ink, the failure to make a final disposition of the estate in the disposing part of it, according to the previously expressed wish of decedent, he added what is there written, then supplied the year from a lapsed memory, and then subscribed his name as a witness, he having been present throughout.   Other reputable lawyers have been known to slightly change or correct a mistake in an executed paper left in their possession, in order that it might conform to and express the true facts, however reprehensible the practice. He states that the dark ink was such as he used in his office. Now, while a mere subsequent writing in of the date alone is of little importance (and a mistake in dating a year ahead has never been known to me, while giving the date of the past year frequently occurs), yet the fact of inserting the clause in the disposing part either renders the alleged will wholly void or void *pro tanto*.   I have frequently had occasion to animadvert upon the use of blank forms, and of leaving blank spaces in wills, and especially where they are left in the custody of the draughtsman.   McCord v. Lounsbury, 5 Dem. Sur. 68, citing the case of Heady's Will, 15 Abb. Pr. (N. S.) 211.   The blanks may be filled with dispositions of property not intended by the testator.   For instance, in this instance there could readily have been added a provision to the effect that if Peter Nevins should die before his arrival at the age of 21 years, the estate should be equally divided among the other children, or any other provisions which might occur to the draughtsman, until the blank

space was entirely filled. Whether the instrument was so tampered with as indicated it is unnecessary to determine, as it must be rejected as a will upon another ground.

The subscription and publication of a testamentary instrument are independent facts, each of which is essential to a complete execution. The two prerequisites are distinct in their nature, as well as their purpose, and an omission to comply with either is fatal to its validity. There must be satisfactory proof of the subscription and publication of the will in the presence of two witnesses. Baskin v. Baskin, 36 N. Y. 416. The case of Chaffee v. Society, 10 Paige, 85, where the testatrix, who had subscribed her will by making her mark, but not in the presence of the attesting witnesses, and afterwards, and in their presence, placed her finger on her name, and said, "I acknowledge this to be my last will and testament," and it was held that the will was not duly executed, was approved in Lewis v. Lewis, 11 N. Y. 220. Now, in this case, the witness Neely testifies that he does not remember seeing Mrs. Nevins sign the paper or make her mark, while Clinch swears positively that he did not. It does not appear that either of them was in the room when the mark was made, except that the attorney testifies that the whole business of the preparation, execution, and witnessing of the paper was done at the same interview, including the signing by the deceased and the three witnesses, but this evidently refers to the interview between him and the deceased. Clearly the witnesses Neely and Clinch were not present when the paper was prepared, and that was done during the "interview." Neither of them saw the paper in her hands, nor saw her make her mark or touch the paper; nor does it appear that the attestation clause was read to or by them. Mr. Clinch says Neely had signed his name before he entered the room, and he was there a half a name before he entered the room, and he was there a half a minute—just long enough to sign his name. Deceased said nothing to him. There was no publication made to him. He only supposed it was a will because the messenger sent to him told him what he was wanted for; but the attorney told him to

sign. He did so, and went out immediately, and neither he nor Neely saw the attorney sign as a witness, and yet the latter testifies that they all signed in the presence of the deceased and of each other, and that she declared it to be her last will and testament in the presence of the three witnesses, and requested them to sign. He seems to testify to what the law requires rather than to the facts as they actually occurred. Under the circumstances, it seems that little reliance can be placed upon his memory of the transaction. He is contradicted on too many vital points by the other entirely disinterested witnesses, and especially by Clinch, who is clear and positive in his statements. The proof is not satisfactory to my mind of the subscription by the deceased of the paper propounded in the presence of two witnesses, and therefore probate must be refused. It is also very doubtful as to whether there was a proper publication, but it is unnecessary to consider that question here.

It may not be improper to remark that in trying the case the learned counsel directed their attention more particularly to the fact of the two different kinds of ink used in the body of the instrument and to inferences to be drawn therefrom and the resulting effects, rather than to the question of a valid subscription and publication. Decree accordingly.